**Eugene CASIAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–83–216–CR.**

Court of Appeals of Texas, Waco.

Aug. 9, 1984.

Allan R. Manka, Deyeso, Manka & Deyeso, San Antonio, for appellant.

Sam D. Millsap, Jr., Criminal Dist. Atty., Elizabeth H. Taylor, Edward F. Shaughnessy, III, Asst. Crim. Dist. Attys., San Antonio, for appellee.

HALL, Justice.

Pleading not guilty and waiving a jury trial, appellant Eugene Casias was found guilty of murder. Punishment was assessed at confinement in the Texas Department of Corrections for twelve years. Without appellant's written confession, the evidence is insufficient to support the conviction. Appellant's motion to suppress his confession was overruled by the trial court upon findings (1) that the confession was not obtained in violation of appellant's right to have counsel present during interrogation that led to the statement, and (2) that the confession was not tainted by illegal detention during the interrogation. These findings are challenged by appellant in his two grounds of error for reversal. We affirm the judgment.

Santos Luna was fatally shot in the "1234 Lounge" in San Antonio on July 5, 1982. This shooting was investigated by Detective Chavarria of the San Antonio Police Department. In the course of this investigation, on July 11, 1982, Chavarria

went to appellant's residence to speak with appellant about the matter. He took Patrolman McGehee of the police department with him. The officers' testimony shows these facts: They arrived at appellant's house about 2:00 p.m. Chavarria knocked at the front door and McGehee went to the back door. A young boy, later identified as appellant's brother, answered the knock and told Chavarria that appellant was out of town. When Chavarria asked the boy if he was "sure," the boy replied "wait a minute" and went back inside the house. At about this time appellant appeared shirtless at the back door. McGehee asked appellant if he was Eugene Casias. When appellant answered "yes," McGehee told him that a detective at the front of house would like to talk to him, and they walked to the front of the house. Chavarria identified himself to appellant and told appellant that he was investigating the murder of Luna at the "1234 Lounge." Appellant told Chavarria that he did not know anything about the shooting, and Chavarria asked appellant if he would go downtown to talk about the matter. Appellant then went inside the house to get his shirt. Chavarria and McGehee followed him into the house for their own safety, since they did not know whether appellant had a gun. After appellant put on his shirt he voluntarily went with the officers to the police station. Appellant was not under arrest at this time and he voluntarily agreed to go to the police station. If he had declined Chavarria's request to go, the officers would have left him at his house. Appellant's grandmother walked in the house about the time appellant and the officers started to leave. Appellant turned to his brother and grandmother and told both of them to call his attorney. This instruction to call an attorney was not directed to the officers, but was directed to the brother and the grandmother. At that time appellant voluntarily went to the police station with the officers. On the way to the police station, the shooting of Luna was not discussed. Chavarria's conversation with appellant at the police station about the shooting began about 2:45 p.m. Before this conversation

began, Chavarria gave appellant his *"Miranda* warnings." These included appellant's right to remain silent; his right to have a lawyer present to advise him before and during any questioning by police officers or attorneys representing the State; his right to have his own lawyer present, or if too poor to hire a lawyer to have the court appoint a lawyer for him free of charge at that time or at any other time; his right if he decided to talk to anyone to stop talking to them at any time he desired; and the fact that the above rights "are continuing rights which can be urged by you at any stage of the proceedings." About five minutes after the conversation began appellant admitted that he had shot the deceased and he agreed to give Chavarria a voluntary statement. Appellant's signed confession that followed shows at its beginning that prior to making the statement appellant was duly warned of his rights by Officer Chavarria (in accordance with the provisions of Vernon's Ann.C.C.P. art. 38.22), including his right to have a lawyer present to advise him prior to and during any questioning and of his right to have a lawyer appointed to advise him prior to and during any questioning if he was unable to employ a lawyer; and it recites that appellant voluntarily waived these rights and the others set out in the warning. Appellant does not read and write the English language, but he speaks and understands English and the statement was read to him and understood by him before he signed it.

Appellant testified as follows: "[Chavarria] came out [to my house] with a camera, and knocking at my door, you know. And I was in the shower, so when I came out of the shower and put on some clothes and went out through the back door where the cop was. And he took me to the front door and he told me that he was going to take a picture. And I didn't want to take no pictures because everybody was out there. And he told me if I didn't take a picture he was taking me in. [I was] embarrassed to take a picture because there was a crowd of people there. He said that he was going

to take me in." Officer Chavarria admitted that he had a camera when he arrived at appellant's house, but he denied that he or Officer McGehee told appellant that appellant would have to go to the police station with them if he did not permit his picture to be taken. Officer McGehee testified that he did not recall any conversation about pictures being taken.

■ Assuming the doubtful proposition that appellant's testimony that he went to the police station to avoid embarrassment by his picture being taken by the officers evidences some form of official coercive detention, the trial court as trier of the facts was not bound to accept this testimony, refuted by the officers, as true. The court's finding that appellant's confession was not tainted by illegal detention implicitly carries the conclusion that the court believed the officers, not appellant. The other evidence supports the court's determination that appellant's trip to the police station was voluntary and that he was not at any time illegally detained by the officers.

Having heard appellant tell his brother and grandmother to call his attorney, Chavarria candidly admitted that he knew that appellant's intention was that someone contact a lawyer on his behalf. But the officer testified further that appellant did not ever say "I'm not going to speak to you until I talk to an attorney," and that appellant did not ever ask the officer for a lawyer. McGehee testified that he never heard the defendant ask for a lawyer. Appellant testified that he did not want the police officer to call a lawyer for him; that he just wanted his family to call the lawyer; that he did not tell Chavarria that he wanted to speak to a lawyer before giving the statement; that he never asked "to have [his] lawyer there with the cops"; and that Chavarria never forced him "to make that confession." His testimony also shows that he was first contacted by his attorney on the next day after he gave the confession.

■ In *Kelly v. State*, 621 S.W.2d 176, 178 (Tex.Cr.App.1981), the defendant's mother arrived at the police station in the afternoon of the second day of the defendant's incarceration and spoke to the defendant and his brother, who was also in custody, for "quite sometime." The defendant's mother made several unsuccessful attempts to contact an attorney during this period in the presence of the defendant and the officer who later took the defendant's confession, but the officer made no effort to assist, apparently because "during this time, the discussion was between him and his brother and his mother." After the mother made the calls, the defendant said to his brother, "let's go ahead and tell him about it." The confession was then taken. In *Curtis v. State*, 640 S.W.2d 615, 618 (Tex.Cr.App.1982), while the defendant and his police escort were leaving his home, a person, not otherwise identified, stopped them and asked the defendant if he had a lawyer, and the defendant replied that he did not and that he did not want one, that he thought his brother was getting one for him. Later, during the course of a conversation with the officer who ultimately took the defendant's written confession, but before the officer had warned the defendant of his rights, the defendant inquired of the officer how he would be provided a court appointed attorney. In both cases the Court of Criminal Appeals ruled that the facts did not support the conclusions that the defendants had invoked their rights to counsel. In our case we hold that appellant's instruction to his brother and grandmother to contact his lawyer, albeit made in the presence of the officer who took his confession, was not a personal invocation of his right to consult with legal counsel before being questioned by the officer.

Appellant's grounds of error are overruled. The judgment is affirmed.